**WEEDIN, Commissioner of Immigration, v. LEE FUNG. ***

No. 6889.

Circuit Court of Appeals, Ninth Circuit.
April 3, 1933.

WILBUR, Circuit Judge, dissenting.

---

Anthony Savage, U. S. Atty., and Hamlet P. Dodd, Asst. U. S. Atty., both of Seattle, Wash. (John F. Dunton, of Seattle, Wash., U. S. Immigration Service, on the brief), for appellant.

Hugh C. Todd, of Seattle, Wash., for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and CAVANAH, District Judge.

CAVANAH, District Judge.

Lee Fung, a Chinese who claims to have been born in China, December 7, 1908, came from there on October 6, 1931, and applied for admission into the United States as a citizen of this country by virtue of being a foreign-born son of Lee Nong, a native-born citizen of the United States. He was denied admission by a Board of Special Inquiry and from which decision he appealed to the Secretary of Labor, who dismissed his appeal and directed that he be returned to China. Upon a petition for a writ of habeas corpus, he was discharged by the court below, and from such order this appeal is taken by the United States Commissioner. The American nativity and citizenship of the alleged father were conceded by the immigration officials, consequently if the appellee were his blood son he would be, under section 1993 of the Revised Statutes (8 USCA § 6), a citizen of the United States.

Therefore, the only question at issue is

*Rehearing denied May 15, 1933.

whether or not in refusing to concede the claimed relationship and denying appellee's admission the immigration officials acted arbitrarily and unfairly, and were their acts in conflict with the principles of justice. The reason given by the immigration authorities as to why appellee was rejected are four discrepancies claimed to appear in the testimony.

First, as to the conflict between the sketches made by the appellee and his father of the home village in China, for they differ in some respects as to the direction, size, number of inhabitants and dwelling houses, and a portion of the village not occupied by buildings being waste land. In the drawings one calls west east and the other calls east west, one of which is turned around. This difference might have occurred to any one who is familiar with the village. An examination of the sketches discloses that each named fifteen homes in the solid portion of the village in which they claimed to have lived, and agreed alike as to the inhabitants of every one of these buildings. This circumstance would show that they both had some knowledge of the village, although they may differ as to what portion is occupied by buildings and what is waste land.

Second, when the father was last in China he had a grocery store. He says that there are wooden shutters in the front of the store which can be opened and closed, and that back where the counters are there are glass windows. Petitioner says there are glass windows in the front part of the store. An apparent discrepancy exists without a difference. It seems that the father's store is located on the side of the Gai Noon river and as to its being possible to walk from their home to the store without crossing the river, both agree as to that.

Third, they both testified that the father owns twelve ows of rice land in China. They differ as to whether it is all in one piece. The petitioner thinks it is all in one piece, while the father says it is not. The father knows of other pieces he owns, and it may be possible that petitioner had in mind one of the other pieces.

Fourth, relates to the time of the death of appellee's grandmother. They both say that the appellee never saw her, and when she died appellee only knows from what he has been told, which might have been incorrect.

These discrepancies are minor matters, collateral to the main issue of relationship,

and are not sufficient evidence to overcome the proof of relationship as appears in the record. For it clearly appears that the father, in August, 1909, mentioned the appellee "Lee Foon (Fung), nine months old." When the father was making a trip to China in August, 1912, he again mentioned his son "three years old," and on his return from that trip in August, 1914, he again mentions him "six years old," and in March, 1922, he again mentions appellee "now fourteen." And at that time when a hearing was on he stated that he had three children born and that two had died, as we find he testified that: "(1) Lee Hen, boy; he would be about twenty years old but died of the flu in 1919; (2) Lee Fung, now fourteen, living in China, single; (3) Lee Ton would be eight years old if living; died in China of the flu in 1919."

This information appears from the immigration records, and it is clear that the relationship claimed exists. There are other circumstances in the record where the father and the appellee agree, which go to establish that the relationship of father and son exists. These circumstances are undisputed, and when we take the record as a whole we are satisfied that the lower court was correct in the conclusion reached that the appellee was the blood son of his father Lee Nong, which entitles him to admission into the United States.

Affirmed.

WILBUR, Circuit Judge (dissenting).

After examining the immigration records, and taking testimony, the Special Board of Inquiry rejected the testimony of the applicant and his alleged father by reason of certain discrepancies therein. These discrepancies appear from the following quotation from their unanimous conclusion:

"The applicant states there are 15 buildings in his village and are shown in a diagram of the village drawn under his supervision. He states that there are two rows of houses at the head of the village and one row across the front of the village. He claims there is a wall around the village. The diagram shows a space containing approximately three-fourths of the village, which the applicant states is waste land containing no trees, no pond, no rice land and no houses. The alleged father says there are from 40 to 50 houses and over 300 people in his village. Likewise he has drawn a diagram of his village, as well as an additional diagram showing the location of the village, river, and store. The alleged father's diagram contains the same number of houses and occupants as shown by the applicant, but while he states there are from 30 to 35 houses in the northwest part of the village he is unable to furnish the names of any of the occupants. The villages are laid out differently according to points of the compass. The alleged father shows in his diagram that the Gai Moon River is directly opposite his house, while the applicant shows in his diagram that the river is another side of the village. It is quite evident that the applicant and his alleged father thought they would only be examined on the houses and rows they became familiar with, but it is equally evident that one of the two was not a resident of the village claimed. It would appear that this discrepancy is fatal to the admission of this applicant.

"The applicant states that about one year after his alleged father returned to China he became a grocery store merchant in Bon Chung See Market, one-half a li [about 880 feet] from his village; that there was a sign attached to the store reading, 'Lee Nong's Grocery Store'; that there was no space on either side of the store; that Teung Sing Grocery Store was on one side and Sho Wah Poultry Store was on the other side; that there were four glass windows in front of the store and that there were about 12 stores in the market. The applicant states that he never went with his father from the village to the store or from the store to the village. Upon re-examination the applicant states that there is no store on either side of his father's store, adjoining, but that the Teung Sing Store is 40 or 50 steps away and the Sho Wah Store is 40 or 50 steps away; that there is a house between his father's store and the Sho Wah Store; and that the glass in the front of his father's store is about 18"x20".

"The alleged father states that there is no building on either side of his store and that there is a space on both sides of his store; that he does not know of Teung Sing or Sho Wah Stores; that there was a sign in front of his store reading 'Quong Fung'; that his store is five lis [about 8800 ft.] from his home village in a place called Goon Chung; that he operated the store for four or five years; that there never was any glass windows in his store; that there are a good many stores in the place where his store is located, but does not remember how many. Upon re-examination he states that there is a store on each side of his store with no space between, but does not remember of the Sho

Wah Store or Teung Sing Stores. The alleged father states that he and the applicant traveled together between the village and the store many times.

"The applicant states that the Gai Moon Stream is between his home village and his father's store, and that to get from the village to the store it is necessary to cross the river by rowboat. This is denied by the alleged father, who says that it is not necessary to cross the river as his village and store are on the same side. This undoubtedly is a serious discrepancy.

"The applicant states that he never saw his father smoke at any time. The alleged father states that he has smoked in the applicant's presence.

"The applicant states that his father's brother, Lee Bing, died five years ago, and is buried on Fon Tow Lon Hill, two lis from the village, and was so advised by his father.

"The alleged father states that Lee Bing died in Canton City five years ago, but does not know where he was buried. He states that he was in his home village at that time and does not know where Lee Bing is buried.

"The parties agree that the applicant's paternal grandfather died before the applicant was born. The applicant states that his father's mother, Lim Shee, died before he was born and his father told him so; that both his grandparents are buried in the Fon Tow Lon Hill.

"The alleged father says his mother, Lim Shee, died in Canton City five years ago and also states that when he was sick in a hospital in Canton City he was visited by Lim Shee, Lee Bing and the applicant; and it will be noted that the applicant claims never to have seen Lee Bing or Lim Shee.

"The applicant has a deep scar near his right wrist and stated that the scar has existed since as long as he can remember. He further states that he does not know of any identification marks of his father.

"The alleged father states that he knows nothing concerning the scar. The identification marks of the alleged father are shown in the record. It would seem that if the alleged father and the applicant ever saw each other they would be familiar with some of the identification marks of each other.

"The applicant stated during his original examination that there was a watch tower, three stories high, located 100 feet in front of his village, but on re-examination some time later stated that he made a mistake and there was no watch tower in front of his village. The question arises—why should the applicant have stated there was a watch tower in front of his village if there was none? This furnishes at least an inference that the applicant did come from some village where there was a watch tower in front.

"The applicant states that his family owns 12 ows of rice land located in front of his village and that the land is all in one parcel, square formation; that he worked on rice land four years; that his family hired men to plant the rice; that all the rice harvested on the land was used in his house, and that when his father was at home his family received all the rice grown on the land and stated that he never worked on the family rice land.

"The alleged father says that he owns 12 ows of rice land, but that the land is not in one piece but is scattered all over; that his family did not work the rice land, but rented it out to others, sometimes received money for rent and sometimes received rice for rent payment.

"It is not reasonable that the foregoing discrepancies would exist if the relationship herein claimed is bona fide."

In response to these discrepancies the alleged father, Lee Nong, addressed a letter to his attorney, who forwarded it to the Department of Labor in Washington, in which he attempted to account for the discrepancies. This letter is in part as follows:

"My mother, Lim Shee, was not friendly to me but was friendly to Lee Bing, my brother, with whom I have had and with whom I was not on good terms, hence Lee Fong did not know of Lim Shee and assumed that she was dead because she was never mentioned. Lim Shee and Lee Bing came to see me in the hospital when I was sick because it was necessary on account of family matters. Of course, on account of the bad feeling they did not call on Lee Fong. Lee Fong is of the newer generation in China and pays no attention to his ancestors and none of their graves, knows nothing about them to speak of and is mostly guessing at what he states.

"Sometimes I walked with Lee Fong to my store; the name was known as Quong Fong; Lee Fong may not know that the Chinese of the older class never put their own names on a store and assumed that because I owned it it must have my name over the door. There were no windows on the front of the store but were back where the counters were. No Chinese store of the older class has windows in front, it is always

built in front so that shutters can be drawn at night to keep people out. That was the way my store was. The Gai Moon is a big river and boats run on it. My store was on same side of it as the Far Yon village; it was not necessary to cross the Gai Moon River to reach my store, but we had to cross a small tributary by a rowboat. This small stream has no name that I remember of. I remember the Teung Sing Store and the poultry shop called Sho Wah, but cannot locate them exactly, as they were not permanent establishments. I have a faint recollection of a small dwelling near my store building, but cannot describe it or exactly fix its location with the clearness I could wish.

"There are a few more than 30 houses inside the wall of the Far Yon village. Lee Fong must refer to the more or less solid block in one corner and omit those scattered about with many vacant lots between them. As they are so scattered people don't usually count them as a part of the village.

"Lee Fong may have the scar as stated, but I never noticed it. If he was hurt when I was out of China I would never have heard of it; if he had been hurt when I was in China the women folks would have fixed him up and never mentioned it to me because I would most likely blame them for it.

"The watch tower mentioned is an actual fact, but it does not belong to our village but to another village. I suppose on thinking it over he remembered it did not belong to his village and changed his testimony.

"I cannot give a description of the rice land; it was left by my father and my wife has always had the managing of it; I only know 12 ows was what my father left and the best of my recollection is that there were several pieces. It is quite possible that Lee Fong only worked on one piece and my wife had the other pieces rented to different people and he didn't know that, so he thinks the piece he was working was all I owned.

"In this connection I would like to state that I have made every effort to bring up Lee Fong in a proper way and he is a good boy, but he is of the newer generation and pays no attention to things that were important to me in my youth, and that will account for some of the differences in the testimony. The generation to which Lee Fong belongs pays no attention to their ancestors, are not accurate in speech or thought, careless and indifferent, hence differences must be expected when their testimony is brought into comparison with one of another generation with different standards."

The discrepancies set out in the opinion of the Assistant Secretary, and also in the opinion of the Special Board, are sustained by the record. While it is true that there is a difference between the alleged father and son as to the relation of the village with the points of the compass, the alleged father's diagram having the double row of houses in the village facing east and the son having them face south, this is only one item in the discrepancies between their testimony. The principal difference is as to the size of the village, the number of houses therein and the relationship of the houses in which the occupants are named to one another, and the relationship of the village to the Gai Moon river. It is, of course, true that while the alleged father and son disagree on these various items included in the discrepancies they do agree upon the relationship which is involved in the application, and it is true that the discrepancies can be disregarded on the theory that they are the result of mistake or inadvertence, lack of memory, but we have not decided this type of cases upon that basis. The question is whether in view of such discrepancies it can be stated that the action of the immigration authorities is so arbitrary and unreasonable that it can be disregarded by the courts.

I think the decision of the immigration authorities should be sustained, and the order of the District Court reversed.